# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**ROBERT S.,**[1]

      **Plaintiff,**

          **v.**

**FRANK BISIGNANO,**[2]
**Commissioner of Social Security,**

      **Defendant.**

      **Case No. 1:23-cv-20312**
      **Magistrate Judge Norah McCann King**

## OPINION AND ORDER

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff Robert S. for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* Plaintiff appeals from the final decision of the Commissioner of Social Security denying that application. After careful consideration of the entire record, including the entire administrative record, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure. For the reasons that follow, the Court affirms the Commissioner's decision.

## I.    PROCEDURAL HISTORY

On October 12, 2020, Plaintiff filed his application for benefits, alleging that he has been disabled since January 17, 2017. R. 219, 227, 401–07. The application was denied initially and

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to plaintiffs in such cases by only their first names and last initials. *See also* D.N.J. Standing Order 2021-10.

[2] Frank Bisignano, the current Commissioner of Social Security, is substituted as Defendant in his official capacity. *See* Fed. R. Civ. P. 25(d).

upon reconsideration. R. 270–74, 276–80. Plaintiff sought a *de novo* hearing before an

administrative law judge ("ALJ"). R. 286 – 87. ALJ Karen Shelton held a hearing on February 1,

2022, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert. R.

142–201. In a decision dated May 12, 2022, the ALJ concluded that Plaintiff was not disabled

within the meaning of the Social Security Act at any time from January 17, 2017, Plaintiff's

alleged disability onset date, through December 31, 2021, the date on which Plaintiff was last

insured for benefits. R. 238–59 ("2022 decision"). Following Plaintiff's request for review, the

Appeals Council vacated the 2022 decision and remanded the matter to the ALJ for resolution of

the following:

- At the February 1, 2022 telephone hearing, the claimant's representative informed the Administrative Law Judge that the claimant's wife, Laurie Sanderson, was present and wished to testify on behalf of the claimant. The Administrative Law Judge declined to allow this third-party witness to testify based on the reason that policy does not allow to have other witness to testify and there is no time for full hearing, so the hearing is limited to the claimant's testimony, and it is very rare for a second person to testify. The Administrative Law Judge then advised the witness to submit a written statement (Hearing recording 01:34:00–57). However, pursuant to HALLEX I-2-6-60B, "The claimant and an appointed representative, if any, have the right to question witnesses to inquire fully into the matters at issue. Generally, the ALJ will provide a claimant or representative broad latitude in questioning witness. However, the ALJ is not required to permit testimony that is repetitive or cumulative, or allow questioning that has the effect of intimidating, harassing, or embarrassing the witness." Therefore, further proceedings are needed to allow the claimant and representative the right to question witness to inquire fully into the matters at issue, and if the Administrative Law Judge finds that the testimony should not be permitted, the Administrative Law Judge will articulate definite reasons why not.

  Upon remand, the Administrative Law Judge will:

- Offer the claimant the opportunity to present hearing testimony from Laurie Sanderson, the claimant's wife, pursuant to HALLEX I-2-6-60B.

- Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 and Social Security Ruling 96-8p).

> In compliance with the above, the Administrative Law Judge will address the evidence, which was submitted with the request for review, take any further action needed to complete the administrative record and issue a new decision.

R. 266–67.

On remand, the ALJ held another hearing on March 15, 2023, at which Plaintiff, who was again represented by counsel, again testified, as did a vocational expert. R. 66–107. In a decision dated April 26, 2023, the ALJ again concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time from his alleged disability onset date of January 17, 2017, through the lapse of his insured status on December 31, 2021. R. 35–60. That decision became the final decision of the Commissioner of Social Security when the Appeals Council declined review on July 18, 2023. R. 1–7. Plaintiff timely filed this appeal pursuant to 42 U.S.C. § 405(g). ECF No. 1. On September 22, 2023, Plaintiff consented to disposition of the matter by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. ECF No. 4.[3] On February 16, 2024, the case was reassigned to the undersigned. ECF No. 11. The matter is ripe for disposition.

## II.    LEGAL STANDARD

### A.    Standard of Review

In reviewing applications for Social Security disability benefits, this Court has the authority to conduct a plenary review of legal issues decided by the ALJ. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to determine if they are supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d

---

[3]The Commissioner has provided general consent to Magistrate Judge jurisdiction in cases seeking review of the Commissioner's decision. *See* Standing Order In re: Social Security Pilot Project (D.N.J. Apr. 2, 2018).

Cir. 2000); *see also* 42 U.S.C. § 405(g). The United States Supreme Court has explained this standard as follows:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019) (internal citations and quotation marks omitted); *see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309, 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018).

The substantial evidence standard is a deferential standard, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see, e.g., Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of

4

social security disability cases ceases to be merely deferential and becomes instead a sham.");
*see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484, 2016 WL 4212102, at *3 (D.N.J. Aug. 9,
2016). The Court has a duty to "review the evidence in its totality" and "take into account
whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting
*Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted));
*see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (stating that substantial evidence exists
only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is
overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or
"ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of
Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see
K.K.*, 2018 WL 1509091, at *4. The ALJ's decision thus must be set aside if it "did not take into
account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp.
at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although an ALJ is not required "to use particular language or adhere to a particular
format in conducting [the] analysis," the decision must contain "sufficient development of the
record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d
501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir.
2000)); *see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an
expression of the evidence s/he considered which supports the result, but also some indication of
the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121
("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication
of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing
*Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a

5

comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981). Absent such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984). Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016).

### B.    Sequential Evaluation Process

The Social Security Act establishes a five-step sequential evaluation process for determining whether a plaintiff is disabled within the meaning of the statute. 20 C.F.R. § 404.1520(a)(4). "The claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden of proof at step five." *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010) (citing *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007)).

At step one, the ALJ determines whether the plaintiff is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b).  If so, then the inquiry ends because the plaintiff is not disabled.

At step two, the ALJ decides whether the plaintiff has a "severe impairment" or combination of impairments that "significantly limits [the plaintiff's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). If the plaintiff does not have a severe impairment or combination of impairments, then the inquiry ends because the plaintiff is not disabled.  Otherwise, the ALJ proceeds to step three.

At step three, the ALJ decides whether the plaintiff's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(d). If so, then the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id*. at § 404.1509. Otherwise, the ALJ proceeds to step four.

At step four, the ALJ must determine the plaintiff's residual functional capacity ("RFC") and determine whether the plaintiff can perform past relevant work. 20 C.F.R. § 404.1520(e), (f). If the plaintiff can perform past relevant work, then the inquiry ends because the plaintiff is not disabled. Otherwise, the ALJ proceeds to the final step.

At step five, the ALJ must decide whether the plaintiff, considering the plaintiff's RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. § 404.1520(g). If the ALJ determines that the plaintiff can do so, then the plaintiff is not disabled. Otherwise, the plaintiff is presumed to be disabled if the

impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

### III.    ALJ DECISION AND APPELLATE ISSUES

Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2021. R. 38. He was 52 years old on January 17, 2017, his alleged disability onset date. R. 59. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity between that date and the date on which his insured status lapsed. R. 38.

At step two, the ALJ found that Plaintiff's depressive disorder, anxiety disorder, and posttraumatic stress disorder were severe impairments. *Id*. The ALJ also found that the following impairments were not severe: diabetes mellitus, hypertension, hyperlipidemia, hypothyroidism, left fifth digit finger fracture, obstructive sleep apnea, vertigo, right wrist injury, degenerative joint disease of the right shoulder, duodenitis, and obesity. R. 38–46.

At step three, the ALJ found that Plaintiff did not suffer an impairment or combination of impairments that met or medically equaled the severity of any Listing. R. 46–48. In reaching this conclusion as to Listings 12.04, 12.06, and 12.15, the ALJ found that Plaintiff had moderate limitations in the four areas of functioning under paragraph B of those Listings and did not meet the criteria of Paragraph C of those Listings, citing to record evidence, including objective medical evidence as well as to Plaintiff's subjective statements and to the testimony and third party report of Plaintiff's wife, Laurie S.:

> In understanding, remembering or applying information, the claimant had a moderate limitation.
>
> The claimant completed an Adult Function Report on October 21, 2020 (Exhibit 4E). He needed reminders to take personal care needs. He could manage his financial matters. The claimant had problems with memory and spoken instructions. He had no problems with understanding.

Laurie S[.], the claimant's spouse, completed a Third Party Adult Function Report (Exhibit 5E). He needed reminders to take personal care needs. He could manage his financial matters. The claimant had problems with memory and following instructions. He had no problems with understanding.

The undersigned notes that the claimant and Ms. S[.] alleged problems with remembering and applying information (Exhibits 4E and 5E). Objective evidence reveals that his memory ranged from intact to impaired (Exhibits 1F and 3F). His insight and judgment ranged from good to fair (Exhibits 1F, 6F, 7F and 12F). He could manage his financial matters (Exhibits 4E and 5E). After carefully considering these factors, the undersigned concludes that the claimant has a moderate limitation in this area of mental functioning.

In interacting with others, the claimant had a moderate limitation.

The claimant completed an Adult Function Report on October 21, 2020 (Exhibit 4E). He shopped in stores. The claimant spent time with others. He had problems getting along with others because he did not want to talk. He had problems getting along with authority figures. He had experienced a job action due to problems getting along with others.

Ms. S[.], the claimant's spouse, completed a Third Party Adult Function Report (Exhibit 5E). He shopped in stores. The claimant spent time with others. He had problems getting along with others because he would get nervous and worried about his temper. He had problems getting along with authority figures because he did not like to be told what to do. He had experienced a job action due to problems getting along with others.

The undersigned finds that the claimant and Ms. S[.] alleged that the claimant had problems getting along with others and authority figures and he experienced a job action for these reasons (Exhibits 4E and 5E). He had problems with anger and irritability. The undersigned notes that the claimant did not like groups of people, he experienced anger episodes or irritability regularly (Exhibit 12F). He was upset when others did not follow his lead (Exhibits 5F, 6F and 7F). He became enraged about once a day (Exhibit 7F). The undersigned considered these factors and assigned a moderate limitation in this area of mental functioning.

With regard to concentrating, persisting or maintaining pace, the claimant had a moderate limitation.

The claimant completed an Adult Function Report on October 21, 2020 (Exhibit 4E). The claimant had problems with concentration and paying attention.

Ms. S[.], the claimant's spouse, completed a Third Party Adult Function Report (Exhibit 5E). The claimant had problems with concentration and paying attention.

9

The undersigned notes that the claimant and Ms. S[.] alleged that the claimant had problems with concentration and paying attention (Exhibits 4E and 5E). Objective evidence reveals that his concentration and attention were intact (Exhibit 3F). To consider the claimant's subjective complaints, the undersigned assigned a moderate limitation in this area of mental functioning.

As for adapting or managing oneself, the claimant had experienced a moderate limitation.

The claimant completed an Adult Function Report on October 21, 2020 (Exhibit 4E). He had problems with stress and changes in routine.

Ms. S[.], the claimant's spouse, completed a Third Party Adult Function Report (Exhibit 5E). He had problems with stress and changes in routine.

The undersigned notes that the claimant and Ms. S[.] alleged that the claimant had problems with stress and changes in routine (Exhibits 4E and 5E). The claimant appeared well groomed during the period at issue (Exhibit 5F). He could manage his safety needs. He experienced episodes when he could not control his emotional state in public (Exhibits 6F, 7F and 12F). The claimant's anxiety increased when stressed (Exhibit 5F). After carefully considering these factors, the undersigned finds that the claimant has a moderate limitation in this area of mental functioning. Because the claimant's mental impairments did not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria were not satisfied.

There is also no evidence to satisfy the requirements of the "C" listing under 12.04, 12.06, and 12.15, which are used when a claimant does not meet the "B" requirements. The medical evidence does not support a conclusion that the claimant relied upon medical treatment, mental health therapy, psychosocial supports or a highly structured setting to diminish his symptoms and signs AND that [he] achieved only a marginal adjustment because his adaptation to the requirements of daily life was fragile and he was unable to function outside his home without substantial psychosocial supports including family members, who administered medication, reminded him to eat, shopped for him, paid his bills and changed their work hours so he was never alone; or he participated in a special education or vocational training program or day program; or he participated in a sheltered, supported or transitional work program; or he received comprehensive 24/7 wrap around mental health services; or he resided in a hospital or institution; or he received assistance from crisis response team, social workers or community mental health workers to meet his physical need; or he resided alone and did not receive support but had a highly structured environment by eliminating all but minimally necessary contact with the world outside his living space.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps

> 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

R. 46 – 48 (referred to by the ALJ as "Finding 4").

At step four, the ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels subject to various non-exertional limitations. R. 48–59. The ALJ also found that this RFC did not permit the performance of Plaintiff's past relevant work as a composite job of meat manager consisting of meat cutter and meat sales manager; a meat cutter; and a composite job consisting of lubrication servicer and tire repairer. R. 58–59.

At step five and relying on the testimony of the vocational expert, the ALJ found that a significant number of jobs—*e.g.*, jobs as an equipment cleaner, a laundry worker, and a cleaner—existed in the national economy and could be performed by Plaintiff with this RFC. R. 59–60. The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act from January 17, 2017, his alleged disability onset date, through December 31, 2021, the date on which he was last insured. R. 59–60.

Plaintiff disagrees with the ALJ's findings at steps two, three, and four and asks that the decision of the Commissioner be reversed and remanded with directions for the granting of benefits. *Plaintiff's Brief,* ECF No. 8; *Plaintiff's Reply Brief*, ECF No. 17. The Commissioner takes the position that his decision should be affirmed in its entirety because the ALJ's decision correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence. *Defendant's Brief*, ECF No. 15.

IV.    **SUMMARY OF RELEVANT MEDICAL EVIDENCE**

A.    **Christopher Williamson, Psy.D.**

On February 26, 2021, Christopher Williamson, Psy.D., a consultative examiner and

clinical psychologist, conducted a mental examination of Plaintiff. R. 1039–41. Dr. Williamson

noted the following background information and subjective statements:

> Mr. S[.] presents for evaluation as a 51-year-old male who is not currently receiving SSI disability benefits. However, he is 100% service connected through the Veterans Administration Medical Center for diagnosis of posttraumatic stress disorder. He has been treating out of the Philadelphia Veterans Administration when he has been able to, more lately it has been telehealth. He first started treating three years ago at the age of 48 due to anxiety and depression.
>
> At the present time, Mr. S[.] reports ongoing issues of depression. He characterizes his mood as sad, down, despondent, and hopeless. He has a history of suicidal ideation but denies any current plan or intent. He attempted to take his life in 2017. He went to the Veterans Clinic, although he was not hospitalized. He is increasingly anxious, nervous, and jittery. He is noticeably tremulous. It was after the depression, anxiety, and suicide attempt that he started treating. He was subsequently diagnosed with posttraumatic stress disorder secondary to his service during the Gulf War. He has ongoing issues of nightmares, flashbacks, and intrusive thoughts. Medically, he has a history of hypertension, diabetes, and hypothyroidism. He denies any issues of substance use or abuse. His current medications include atorvastatin, HCTZ, fluoxetine, meclizine, BuSpar, metformin, insulin, and levothyroxine.
>
> Mr. S[.] reports that he served in the army for three years with an honorable discharge. He currently resides with his wife. He has three grown children. He reports a positive relationship with his two sisters. His parents are since deceased. He denies any family history of psychiatric illness. He is a high school graduate. He has worked as a meat cutter. He was also working with cars. He states that he is unable to work now. He has difficulty being around others due to his anxiety. He has issues of anger management, threatening co-workers. He flies off the handle and throws things. He cannot be near people as he states that he cannot cope. He moved out of Philadelphia for peace and quiet.

R. 1039–40. Upon mental examination, Dr. Williamson observed the following:

> He arrived on time as scheduled. He was casually dressed and groomed, appearing his stated age. He was pleasant and cooperative throughout. There was no evidence of a formal thought disorder. There were no noted compulsions of thinking and/or behavior. Verbalizations were clear, coherent, and goal-directed. His overall mood

12

appeared depressed and anxious. His affect was congruent. He appeared extremely anxious. He was tremulous throughout. He has struggled with suicidal ideation but denies any current plan or intent. He denies any issues of substance use or abuse. He could repeat up to 7 digits forwards and 5 digits backwards. He was able to accurately complete Serial 7's, subtracting 7 from 100 in reverse order. He could complete simple mathematical calculations of addition and subtraction. His overall fund of knowledge appeared to be in the average range. Abstract reasoning appeared dull. He was well oriented to time, place and person, as well as recent current events. He could recall 2 out of 3 common objects at 5- and 10-minute intervals.

R. 1040. Dr. Williamson diagnosed the following:

| AXIS I: | Posttraumatic Stress Disorder. |
| | Major Depressive Disorder. |
| | Generalized Anxiety Disorder. |
| AXIS II: | Deferred. |
| AXIS III: | Hypertension, diabetes, and hypothyroidism. |
| AXIS IV: | Financial, housing, and employment. |
| | Chronic medical and ongoing psychiatric concerns. |

*Id.* According to Dr. Williamson, Plaintiff's "overall prognosis remains guarded due to the chronicity and severity of his symptom presentation." *Id.*

**B.    Laya Varghese, D.O.**

On January 12, 2022, Laya Varghese, D.O., Plaintiff's treating physician since 2013, R. 1358, 1361, completed two check-the-box, and fill-in-the-blank forms regarding Listing 12.04, which addresses depressive, bipolar, and related disorders, and Listing 12.06, which addresses anxiety and obsessive compulsive disorders. R. 1357–58, 1360–61. In considering the paragraph A criteria for Listing 12.04, Dr. Varghese checked boxes indicating that Plaintiff had a depressive disorder characterized by depressed mood, sleep disturbance, observable psychomotor agitation or retardation, feelings of guilt or worthlessness, and difficulty in concentrating or thinking. R. 1357. In considering the paragraph A criteria for Listing 12.06, Dr. Varghese checked boxes indicating that Plaintiff had an anxiety disorder characterized by restlessness, difficulty concentrating, irritability, and sleep disturbance; and a panic disorder or

agoraphobia characterized by a disproportionate fear or anxiety about at least two different situations ("for example, using public transportation, being in a crowd, being in a line, being outside of your home, being in open spaces"). R. 1360. As to the paragraph B of Listings 12.04 and 12.06, Dr. Varghese checked boxes indicating that Plaintiff had extreme limitations in his ability to interact with others; concentrate, persist or maintain pace; and adapt or manage oneself. R. 1358, 1361. When considering the paragraph B criteria of Listing 12.04, Dr. Varghese opined that Plaintiff had an extreme limitation in his ability to understand, remember, or apply information, but opined that Plaintiff had a marked limitation in that same area when considering the criteria for Listing 12.06. *Compare* R. 1358 *with* R. 1361. As to the paragraph C criteria of Listings 12.06 and 12.04, *i.e.*, whether Plaintiff had a mental disorder that was "serious and persistent," Dr. Varghese checked boxes indicating that the following were present:

> 1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder; and

> 2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life.

R. 1358, 1361. Dr. Varghese indicated that Plaintiff's condition had persisted since the "mid 1990s." *Id*.

On January 22, 2022, Dr. Varghese completed a check-the-box, and fill-in-the-blank form regarding Listing 12.15, which addresses trauma and stressor-related disorders. R. 1367–68. In considering the paragraph A criteria for this Listing, Dr. Varghese checked boxes indicating that Plaintiff had exposure to actual or threatened death, serious injury, or violence; subsequent involuntary re-experiencing of the traumatic event ("for example, intrusive memories, dreams, or flashbacks"); avoidance of external reminders of the event; disturbance in mood and behavior; and increases in arousal and reactivity ("for example, exaggerated startle

response, sleep disturbance"). R. 1367. As to the paragraph B of Listing 12.15, Dr. Varghese

checked boxes indicating that Plaintiff had a marked limitation in his ability to understand,

remember, or apply information, and extreme limitations in his ability to interact with others;

concentrate, persist or maintain pace; and adapt or manage oneself. *Id*. As to the paragraph C

criteria of Listing 12.15, Dr. Varghese checked the two boxes indicating that the following were

present:

> 1. Medical treatment, mental health therapy, psychosocial support(s), or a highly
> structured setting(s) that is ongoing and that diminishes the symptoms and signs of
> your mental disorder; and
>
> 2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in
> your environment or to demands that are not already part of your daily life.

R. 1367–68.

> In a letter dated June 28, 2022, Dr. Varghese wrote the following:
>
> To whom it may concern:
>
> [Plaintiff] is a current patient under my care in the Mental Health Clinic at the
> Philadelphia VA Medical Center. He has been receiving treatment in our clinic for
> symptoms of Post Traumatic Stress Disorder and Anxiety for over ten years. I last
> evaluated Mr. S[.] on June 3, 2022.
>
> I am writing this letter on his behalf to request that he be permanently recused from
> Jury Duty service given his chronic mental health condition. He experiences
> chronic anxiety attacks, intrusive memories, mood changes, and difficulty being in
> groups, among other symptoms, that would significantly impair his ability to
> participate effectively on a jury.

R. 1486.

## V.    DISCUSSION

### A.    Evidence Underlying  the Decision of the Department of Veterans Affairs

Plaintiff first argues that the ALJ failed to meaningfully consider evidence underlying a

rating decision issued by the Department of Veterans Affairs (the "VA") on September 28, 2020

("VA decision"). *Plaintiff's Brief*, ECF No. 8, pp. 14–27; *Plaintiff's Reply Brief*, ECF No. 17, pp. 2–6. For the reasons that follow, this Court disagrees.

For claims filed on or after March 27, 2017,[4] "[d]ecisions by other governmental agencies and nongovernmental entities" are "inherently neither valuable nor persuasive to the issue of whether [a claimant is] disabled . . . under the Act[.]" 20 C.F.R. § 404.1520b(c)(1); *see also id*. at § 404.1504 (stating that "[o]ther governmental agencies and nongovernmental entities—such as the Department of Veterans Affairs . . . — make disability, blindness, employability, Medicaid, workers' compensation, and other benefits decisions for their own programs using their own rules" and that that decision "is not binding on" Social Security disability decisions). However, the Social Security Administration ("SSA") "will consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that [the SSA] receive[s] as evidence in [the claimant's] claim in accordance with § 404.1513(a)(1) through (4)." *Id*. at § 404.1504.

In the present case, Plaintiff argues that the ALJ did not "meaningfully consider" underlying VA evidence such as two VA Compensation and Pension ("C&P") evaluations conducted by Mitchell Gottsagen, Ed.D., on August 23, 2017, and September 15, 2020, in violation of 20 C.F.R. § 404.1504 *Plaintiff's Brief*, ECF No. 8, pp. 14–27 (pointing to specific information contained in those reports and citing, *inter alia*, *McClellon v. Kijakazi*, No. 6:20-CV-3216-SAL, 2021 WL 6133847, at *6 (D.S.C. Dec. 28, 2021); *Michael B. v. Kijakazi*, No. 1:20-CV-14639, 2022 WL 3913302, at *7 (D.N.J. Aug. 31, 2022), *reconsideration denied*, No. 1:20-CV-14639, 2022 WL 16743966 (D.N.J. Nov. 7, 2022)); *see also* R. 988–1003, Exhibit 1F/333–48 ("August 2017 C&P report"); 796–805; Exhibit 1F/141–150 ("September 2020 C&P report").

---

[4] As previously noted, Plaintiff's claim was filed on October 12, 2020.

Plaintiff also specifically argues that Dr. Gottsagen opined that Plaintiff's PTSD met the criteria under DSM-5, which tracks the language of Listing 12.15 regarding trauma and stressor-related disorders. *Id*. at 25

The Commissioner argues that § 404.1504 does not require that the ALJ conduct any specific type of analysis of such evidence, *Defendant's Brief*, ECF No. 15, pp. 17–20, and notes that the ALJ, in fact, considered and discussed VA evidence, including the August 2017 and the September 2020 reports. *Id*.  Moreover, the Commissioner points out that the ALJ found at step two that Plaintiff's PTSD was a severe impairment and expressly acknowledged that Plaintiff had received a 100% service-connected rating for that impairment. *Id*. The Commissioner points out that, although the DSM-5 tracks the requirements of Paragraph A of Listing 12.15, the ALJ properly explained why Plaintiff did not meet either the Paragraph B or the Paragraph C criteria of that Listing. *Id*. The Commissioner contends that any failure on the part of the ALJ to expressly recite the VA evidence in its entirety is not fatal. *Id*. (arguing further that *McClellon* and *Michael B.*, cases cited by Plaintiff, are distinguishable).

According to Plaintiff, the ALJ simply pointed to the VA C&P examinations and her boilerplate statements or summary of that evidence "cannot take the place of the meaningful consideration required." *Plaintiff's Reply Brief*, ECF No. 17, pp. 2–3. Plaintiff goes on to argue that the ALJ did not explain why she failed to credit "key findings" made by the VA in support of 100% service-connected disability. *Id*. at 4–6 (contending that *McClellon* and *Michael B.* support remand).

Plaintiff's arguments are not well taken. The ALJ expressly stated that she "considered the particulars of examinations undertaken by the VA when reaching their conclusions about the claimant's disability status." R. 58. Notably, the ALJ specifically referred to Dr. Gottsagen's

August 2017 and September 2020 C&P reports when crafting the RFC. R. 50–52. The ALJ also

recounted and considered at step four the years of treatment Plaintiff received at the VA. R. 50–

52, 55–58. The ALJ further noted in her step four discussion that Plaintiff was found to be 100

percent service-connected disabled. R. 51, 55–56. The fact that the ALJ did not expressly recount

and weigh every detail in Plaintiff's VA records is not determinative; § 404.1504 simply requires

that the ALJ "consider" the underlying evidence, which the ALJ assuredly did. R. 50–58.[5] *See*

*Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001) (holding that an ALJ is "not expect[ed] to

make reference to every relevant treatment note in a case[.]"). *See also Dietzel v. Comm'r of Soc.*

*Sec.*, No. 1:22-CV-00053-RJC, 2023 WL 2436014, at *3 (W.D.N.C. Mar. 9, 2023) (finding that

under § 404.1504, "the ALJ was only required to consider all supporting evidence underlying

another agency's disability decision" and that "[t]he ALJ did that here" where "the ALJ's

decision confirms that he considered 'any supporting evidence of [the claimant's] VA decision,'

and throughout the ALJ's decision he considered and discussed VA medical records"); *cf. Jones*

*v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (explaining that, when crafting the RFC, the ALJ

is not required "to use particular language or adhere to a particular format in conducting [that]

analysis[;]" instead, the ALJ's decision must contain "sufficient development of the record and

explanation of findings to permit meaningful review").

---

[5] In this regard, Plaintiff's reliance on *McClellon* and *Michael B.* is unavailing. In *McClellon*, the Court affirmed the ALJ's decision where, *inter alia*, the ALJ's discussion of the VA evidence underlying the rating decision satisfied the requirements in 20 C.F.R. § 404.1504. *McClellon*, 2021 WL 6133847, at *6–7. Like the ALJ in the instant case, the ALJ in *McClellon* noted the VA service connected disability finding and acknowledged subjective complaints in the VA evidence and discussed examination findings and treatment when crafting the RFC. *Id.* In *Michael B.*, the Court remanded the action where, unlike in the present case, the ALJ ignored evidence underlying the VA's decision when finding that the claimant had no severe mental impairment at step two of the sequential evaluation. *Michael B.*, 2022 WL 3913302, at *6–7. As detailed above, in the present case, the ALJ in this case expressly stated that she considered the underlying VA evidence and detailed findings from that evidence.

### B.    Opinion Evidence

Plaintiff also challenges the ALJ's consideration of the opinions of Laya Varghese, D.O.,

Plaintiff's treating physician. *Plaintiff's Brief*, ECF No. 8, pp. 27–40; *Plaintiff's Reply Brief*,

ECF No. 17, pp. 6–11. For the reasons that follow, this Court disagrees.

An ALJ must evaluate all record evidence in making a disability determination. *Plummer,*

186 F.3d at 433; *Cotter,* 642 F.2d at 704. The ALJ's decision must include "a clear and

satisfactory explication of the basis on which it rests" sufficient to enable a reviewing court "to

perform its statutory function of judicial review." *Cotter*, 642 F.2d at 704–05. Specifically, the

ALJ must discuss the evidence that supports the decision, the evidence that the ALJ rejected, and

explain why the ALJ accepted some evidence but rejected other evidence.  *Id*. at 705–06; *Diaz v.*

*Comm'r of Soc. Sec.*, 577 F.3d 500, 505–06 (3d Cir. 2009); *Fargnoli*, 247 F.3d at 42  ("Although

we do not expect the ALJ to make reference to every relevant treatment note in a case . . . we do

expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record

consistent with his responsibilities under the regulations and case law."). Without this

explanation, "the reviewing court cannot tell if significant probative evidence was not credited or

simply ignored." *Cotter*, 642 F.2d at 705; *see also Burnett,* 220 F.3d at 121 (citing *Cotter*, 642

F.2d at 705).

For claims like Plaintiff's, the applicable regulation requires that the ALJ consider the

following factors when considering all medical opinions: (1) supportability; (2) consistency; (3)

relationship with the claimant, including the length of the treating examination, the frequency of

examinations, and the purpose of the treatment relationship; (4) the medical source's

specialization; and (5) other factors, including, but not limited to, "evidence showing a medical

source has familiarity with the other evidence in the claim or an understanding of our disability

program's policies and evidentiary requirements." 20 C.F.R. § 404.1520c(c). The regulation emphasizes that "the most important factors [that the ALJ and Commissioner] consider when [] evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id*. at § 404.1520c(a). As to the supportability factor, the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id*. at § 404.1520c(c)(1).  As to the consistency factor, the regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id*. at § 404.1520c(c)(2).

The applicable regulation also requires the ALJ to articulate her "consideration of medical opinions and prior administrative medical findings" and articulate in the "determination or decision how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." *Id*. at § 404.1520c(b). As previously noted, "[s]upportability and consistency are the most important factors. . . . ALJs need not explain their determinations regarding the other factors, but they must discuss supportability and consistency." *Gongon v. Kijakazi*, 676 F. Supp. 3d 383, 394 (E.D. Pa. 2023) (citations omitted); *see also Stamm v. Kijakazi*, 577 F. Supp. 3d 358, 370 (M.D. Pa. 2021) ("Generally, the ALJ may, but is not required to, explain his or her consideration of the other factors, but if there

are two equally persuasive medical opinions about the same issue that are not exactly the same,

then the ALJ must explain how he or she considered the other factors.").

At step four of the sequential evaluation process, the ALJ in this case found that Plaintiff

had the RFC to perform a full range of work at all exertional levels subject to certain

nonexertional limitations:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he can frequently handle and finger. Able to understand, remember, and carry out simple, routine, and repetitive tasks; in a routine work environment with few changes, and can make simple work decisions, doing work that is goal oriented rather than strict quota oriented. Can work for 2 hours before needing a standard 15 minute break. Can have occasionally contact with supervisors and coworkers in proximity but not on joint or shared tasks and no contact with the public.

R. 48. In reaching this determination, the ALJ found, among other things, that Dr. Varghese's

opinions were "partially persuasive[,]" reasoning as follows:

> Laya Varghese, D.O., concluded on January 12, 2022 that the claimant had a marked limitation in his ability to understand, remember or apply information, and an extreme limitation in his ability to interact with others, concentrate, persist or maintain pace and adapt or manage himself due to his anxiety (Exhibit 9F). He additionally met the "paragraph C" criteria. She additionally concluded that he had extreme limitation in his ability to understand, remember or apply information, and in his ability to interact with others, concentrate, persist or maintain pace and adapt or manage himself due to his depressive disorder (Exhibit 8F). He additionally met the "paragraph C" criteria.

> Laya Varghese, D.O., concluded on January 22, 2022 that the claimant had a moderate limitation in his ability to understand, remember or apply information, a marked limitation in his ability to interact with others and concentrate, persist or maintain pace and an extreme limitation in his ability to adapt or manage himself (Exhibit 11F). He met the "paragraph C" criteria as well.

> Dr. Vargese concluded on June 28, 2022 that the claimant was permanently recused from jury duty due to his mental impairments (Exhibit 12F).

> The undersigned finds that Dr. Varghese' opinions are found to be partially persuasive (Exhibits 8F, 9F, 11F and 12F). The undesigned finds that they are supported by her examination findings. The undersigned finds that her opinion that

the claimant had a moderate limitation in his ability to understand, remember or apply information is consistent with the medical record as a whole for the reasons noted in Finding 4[6] above. The remainder of the opinions are not consistent with the medical record as a whole for the reasons noted in Finding 4 above and did not consider the claimant's undertreated status prior to the date last insured as she prescribed multiple medications but the claimant continued to focus on treatment with Prozac alone and he resisted her efforts for him to engage in treatment to address his PTSD and ongoing anger as described above. He did not attend anger management until after the date last insured (Exhibit 12F). Finally, Dr. Varghese has not established that the claimant is fragile as required under "paragraph C" and the criteria presented in the opinions she completed did not address this factor accurately so that she could properly respond.

R. 57–58.

In challenging the ALJ's consideration in this regard, Plaintiff first argues that the ALJ erred in finding that the paragraph C criteria were not presented properly to Dr. Varghese, contending that the forms created by counsel and completed by that physician tracked the specific paragraph C criteria of Listings 12.04C, 12.06C, and 12.15C. *Plaintiff's Brief*, ECF No. 8, pp. 31–35; *see also Plaintiff's Reply Brief*, ECF No. 17, pp. 6–8. Plaintiff further insists that the evidence supports Dr. Varghese's opinion that Plaintiff in fact meets the criteria of paragraph C. *Id.*

Plaintiff's argument is not well taken. As an initial matter, the Court notes that an opinion about whether or not a claimant meets or medically equals any listing, which is an issue reserved to the Commissioner, is inherently neither valuable nor persuasive. 20 C.F.R. §404.1520b(c)(3)(iv); *Pintal v. Colvin*, No. CIV.A. 1:13-127, 2014 WL 2049100, at *2 (W.D. Pa. May 19, 2014), *aff'd sub nom. Pintal v. Comm'r of Soc. Sec.*, 602 F. App'x 84 (3d Cir. 2015) ("The ultimate determination of whether an individual's impairments meet or equal a listed impairment is reserved to the Commissioner alone."). Moreover, the forms completed by counsel

---

[6] As noted above, the ALJ detailed supporting evidence in "Finding 4" under step 3 of the sequential evaluation.

addressing the paragraph C criteria of Listings 12.04C, 12.06C, and 12.15C omit any explanation or definitions of significant concepts relating to those criteria, including, *e.g.*, the type of treatment that would satisfy the first criterion and the meaning of "marginal adjustment" in the second criterion of that paragraph:

> C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:
>
> 1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (*see 12.00G2b*); and
>
> 2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (*see 12.00G2c*).

20 C.F.R. § Pt. 404, Subpt. P, App. 1, §§ 12.04C, 12.06C, and 12.15C (emphasis added);

*compare with* R. 1358, 1361, 1368 (omitting references to § 12.00G2c, b).

> b. The criterion in C1 is satisfied when the evidence shows that you rely, on an ongoing basis, upon medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s), to diminish the symptoms and signs of your mental disorder (see 12.00D). We consider that you receive ongoing medical treatment when the medical evidence establishes that you obtain medical treatment with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for your medical condition. *We will consider periods of inconsistent treatment or lack of compliance with treatment that may result from your mental disorder. If the evidence indicates that the inconsistent treatment or lack of compliance is a feature of your mental disorder, and it has led to an exacerbation of your symptoms and signs, we will not use it as evidence to support a finding that you have not received ongoing medical treatment as required by this paragraph.*
>
> c. The criterion in C2 is satisfied when the evidence shows that, despite your diminished symptoms and signs, you have achieved only marginal adjustment. *"Marginal adjustment" means that your adaptation to the requirements of daily life is fragile*; that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life. We will consider that you have achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of your symptoms and signs and to deterioration in your functioning; for example, you have

> become unable to function outside of your home or a more restrictive setting, without substantial psychosocial supports (see 12.00D). Such deterioration may have necessitated a significant change in medication or other treatment. Similarly, because of the nature of your mental disorder, evidence may document episodes of deterioration that have required you to be hospitalized or absent from work, making it difficult for you to sustain work activity over time.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00G2c, b (emphasis added). In other words, the forms provided to Dr. Varghese failed to specify necessary terms and concepts. R. 1358, 1361, 1368. That omission undermines her opinion that Plaintiff's mental impairments met the criteria of the Listings, and, under these circumstances, the Court cannot say that the ALJ erred in discounting Dr. Varghese's opinion on this basis. In any event, this factor was but one reason that the ALJ cited when discounting Dr. Varghese's opinions.[7]

Plaintiff also insists that Dr. Varghese's opinion regarding the paragraph C criteria is supported by that physician's finding that Plaintiff has an extreme limitation in his ability to interact with others and to adapt and manage himself (part of the paragraph B criteria) and that his ability to adapt to the requirements of daily functioning is "fragile." *Plaintiff's Brief*, ECF No. 8, pp. 32–35. In support, Plaintiff points to his wife's hearing testimony and third party report. *Id*. at 34. However, as detailed earlier, the ALJ expressly considered this evidence when concluding that Plaintiff had only moderate limitations in his abilities to interact with others and to adapt and to manage himself. R. 47. Plaintiff's argument boils down to nothing more than a disagreement with the ALJ's decision, which for the reasons discussed in more detail below, is supported by substantial evidence. *See Perkins v. Barnhart*, 79 F. App'x 512, 514–15 (3d Cir. 2003) ("Perkins's argument here amounts to no more than a disagreement with the ALJ's

---

[7] As previously noted, the ALJ found persuasive Dr. Varghese's opinion that Plaintiff had a moderate limitation in his ability to understand, remember, or apply information, but found that physician's remaining opinions were unpersuasive. R. 58.

decision, which is soundly supported by substantial evidence."). To the extent that Plaintiff

invites the Court to reweigh the evidence, the Court declines to do so. *See Chandler v. Comm'r*

*of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011) ("Courts are not permitted to reweigh the evidence

or impose their own factual determinations [under the substantial evidence standard].").

Plaintiff also argues that the ALJ did not properly address the consistency factor and

wrongly found that, in rendering her opinions, Dr. Varghese did not consider Plaintiff's

undertreated status prior to the date on which he was last insured. *Plaintiff's Brief*, ECF No. 8,

pp. 35–40; *Plaintiff's Reply Brief*, ECF No. 17, pp. 8–11. The Court is not persuaded that these

arguments establish a basis for remand.

As to consistency, Plaintiff specifically contends that the ALJ's finding that Dr.

Varghese's opinions were "not consistent with the medical record as a whole" did not include the

level of specificity because she failed to explain how the opinions were inconsistent with the

medical record. *Plaintiff's Brief*, ECF No. 8, pp. 35–38; *Plaintiff's Reply Brief*, ECF No. 17, p. 9.

Plaintiff also insists that Dr. Varghese's opinions are, in fact, consistent with the record,

including the two VA C&P reports and Dr. Williamson's findings, and he argues that "some

normal findings" are "not inconsistent with a finding of disability." *Plaintiff's Brief*, ECF No. 8,

pp. 38–41; *Plaintiff's Reply Brief*, ECF No. 17, pp. 9–10. Plaintiff's arguments are not well

taken.

As a preliminary matter, the ALJ expressly stated that Dr. Varghese's opinions (except

for the opinion that Plaintiff was moderately limited in his ability to understand, remember or

apply information) "is consistent with the medical record as a whole for the reasons noted in

Finding 4[.]" R. 58. As detailed above, the ALJ explained at length in Finding 4 why she found

that Plaintiff suffered only moderate limitations in the four functional areas (the paragraph B

criteria of Listings 12.04, 12.06, and 12.15) and did not suffer a serious and persistent mental

disorder (the paragraph C criteria of those Listings). R. 46–48. In making those findings, the ALJ

expressly considered and cited to record evidence, including such objective evidence as

examination findings, Plaintiff's subjective complaints, and Plaintiff's wife's hearing testimony

and third party report. *Id*. Moreover, the ALJ went on to detail years of record evidence at step

four, including, *inter alia*, that Plaintiff had no delusions or hallucinations; insight, reasoning,

and judgment were intact, good, or fair; memory ranged from intact to impaired; cooperative and

calm behavior at times; logical and coherent thought processes; anxious, depressed, and agitated

mood and affect at times; normal speech; Plaintiff did not engage in therapy; and Plaintiff made

progress once he attended anger management sessions after the lapse of his insured status. R. 50–

57. The ALJ also specifically detailed record evidence regarding Plaintiff's undertreated status

that warranted no more than moderate mental limitations, contrasting that evidence with Dr.

Varghese's extreme findings:

> As to the claimant's mental impairments, the undersigned notes that the claimant
> initially underwent treatment with the Military Family Clinic at the University of
> Pennsylvania on March 24, 2017 (Exhibits 4F and 5F). The medical record reflects
> that he did not follow treatment suggestions during his participation. He indicated
> to treating medical sources that he had been awarded benefits from the VA for his
> PTSD and feared losing them if he got better. The undersigned additionally notes
> that much of the behavior he described with regard to his work and reasons for
> leaving occurred 1) before he started any mental health treatment and so at the time
> it occurred he was completely untreated and 2) the circumstances he described in
> 2017, which was closer in time than his later descriptions, vary significantly
> regarding his reasons for leaving work than he reported later (Exhibits 1F and 5F).
> He stopped treatment with the Military Family Clinic for a period of time after
> concluding that he wanted to return to the VA (Exhibit 5F).
>
> The claimant additionally treated with the VA between August and November 2017
> (Exhibit 1F). While he underwent evaluations and treatment, his medications were
> managed through the Military Family Clinic. He attended a total of 4 out of 8
> sessions of individual therapy and 2 of 3 sessions for medication management at
> the Military Family Clinic prior to discharge (Exhibit 5F).

After he stopped treatment at the Military Family Clinic, he underwent approximately three treatment sessions with the VA concentrating on his mental health between December 2017 and December 2020 (Exhibit 1F). He indicated that he was 100 percent service connected in his disability through the VA and worried about it being taken away suggesting that he was not working toward improvement by engaging in mental health treatment for this reason.

Thereafter, the claimant participated in consistent treatment with the VA between December 2020 and January 2022 (Exhibits 6F and 7F). The claimant's medications in December 2020 included Prozac, a medication the claimant generally continued throughout his treatment, but one which did not address his PTSD. Additional medications were prescribed but the claimant either experienced side effects and did not like the results from these medications. By November 2021, he expressed to his prescribing medical source that he preferred not to start any new medications (Exhibit 6F). Dr. Varghese attempted to have the claimant participate in therapy on multiple occasions to address his PTSD and anger but the claimant declined because of a fear of commitment and being watched. However, the undersigned refers back to his previous statements about his underlying fear of losing his benefits if his PTSD improved. The suggested group therapy and treatment for PTSD were directed at addressing the lingering effects of his PTSD including his ongoing anger. His PTSD was the basis for his 100 percent disability finding with the VA (Exhibit 1D). As a result, the undersigned finds that overall, the claimant must be evaluated from the perspective of an undertreated individual, who has not been shown to be refractory to a full complement of treatment prior to the date last insured.

Even after the date last insured, the claimant stopped treatment with Buspar but continued treatment with Prozac in March 2022 (Exhibit 12F). He was next placed on Wellbutrin and his depressive symptoms came under control. However, he continued to experience anger and underwent 12 anger management treatment sessions and made progress during the treatment. However, he reported ongoing issues with social anxiety and ultimately started individual therapy for social anxiety, which he admitted that he had never treated in the past. However, he underwent one treatment session and the medical record suggests that he did not return for additional sessions. The claimant continues to remain undertreated even after the date last insured.

The undersigned finds that the claimant is limited to a moderate extent in all areas of mental functioning despite the claimant's undertreated status for the reasons noted in Finding 4.

R. 55–56.

The Court finds that the ALJ's discussion in this regard provides substantial support for her finding that Dr. Varghese's extreme opinions were inconsistent with the record evidence. *See*

20 C.F.R. § 404.1520c(c)(2) (explaining that a medical opinion is more persuasive "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim"); *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) ("The ALJ, of course, need not employ particular 'magic' words: '*Burnett* does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis.'") (quoting *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004)); *B.K. v. Comm'r of Soc. Sec. Admin.*, No. CV 21-5732, 2022 WL 1718047, at *4 (D.N.J. May 27, 2022) ("In terms of consistency, a medical opinion will be more persuasive when it is consistent 'with the evidence from other medical sources and nonmedical sources in the claims.'") (internal citations omitted); *Serrano v. Kijakazi*, No. CV 20-3985, 2021 WL 4477137, at *3–4 (E.D. Pa. Sept. 30, 2021) ("In this case, the ALJ discussed and analyzed the evidence extensively before determining the persuasiveness of the medical opinions. . . . The ALJ was not required to repeat this information for the sake of elaborating on her findings of persuasiveness.").

To the extent that Plaintiff insists that the ALJ erred by failing to properly consider evidence that Plaintiff believes is consistent with Dr. Varghese's opined limitations, this Court must uphold the ALJ's decision even if contrary evidence justifies the opposite conclusion. *See Messina v. Comm'r of Soc. Sec.*, 844 F. App'x 586, 589–90 (3d Cir. 2021) ("Yet we cannot reweigh the evidence or make our own factual determinations. . . . We will uphold the decision if it is supported by substantial evidence in the record, even if we would have decided the factual inquiry differently.") (citations omitted); *Johnson v. Comm'r of Soc. Sec.*, 497 F. App'x 199, 201 (3d Cir. 2012) (stating that the Court "will uphold the ALJ's decision even if there is contrary evidence that would justify the opposite conclusion, as long as the 'substantial evidence'

28

standard is satisfied.") (citing *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986)); *Chandler*, 667 F.3d at 359; *Hatton v. Comm'r of Soc. Sec. Admin.*, 131 F. App'x 877, 880 (3d Cir. 2005) ("When 'presented with the not uncommon situation of conflicting medical evidence . . . [t]he trier of fact has the duty to resolve that conflict.'") (quoting *Richardson v. Perales*, 402 U.S. 389, 399 (1971)).

Plaintiff goes on to argue that the ALJ improperly concluded that Dr. Varghese did not consider Plaintiff's undertreated status when discounting that physician's opinion. *Plaintiff's Brief*, ECF No. 8, pp. 35–36; *Plaintiff's Reply Brief*, ECF No. 17, pp. 9–11; *see also* R. 58. According to Plaintiff, "Dr. Varghese was well aware of [Plaintiff's] difficulties engaging in therapy as she referenced this fact frequently in her treating notes." *Plaintiff's Brief*, ECF No. 8, p. 35; *see also id.* at 35–36 (citing instances where that physician noted that Plaintiff was anxious about treatment and was fearful of speaking around people); *Plaintiff's Reply Brief*, ECF No. 17, pp. 9–11 (raising similar arguments). The Court is not persuaded that the ALJ erred in her consideration in this regard. While Plaintiff points to evidence that Dr. Varghese acknowledged Plaintiff's "difficulties engaging in therapy[,]" nowhere does he point to evidence that Dr. Varghese was aware that Plaintiff worried that improving his mental health would jeopardize his service-related benefits. *See Plaintiff's Brief*, ECF No. 8, pp. 35–36; *Plaintiff's Reply Brief*, ECF No. 17, pp. 9–11.[8] Indeed, Dr. Varghese made no mention of this worry. *See* R. 1357–58, 1367–

---

[8] The ALJ expressly noted that Plaintiff had expressed difficulty engaging in therapy. R. 50 ("He hated coming to therapy. He admitted that facing someone and talking made him feel embarrassed and not intelligent."), 51 ("He admitted to depression but did not feel that mental health care was helping. He informed her that he was reluctant to restart treatment with behavioral health because he did not like to talk to people."), 52 ("The claimant indicated that he was not in therapy due to a fear of talking in front of someone and someone getting into his head."; "When asked about therapy, the claimant stated that sitting with someone and speaking about himself induced more anxiety."), 53 ("He had not joined the group session because of fear of commitment and being watched. He preferred not to start a new medication."), 54 ("He had

29

68, 1360–61, 1486. Based on this record, the Court cannot say that the ALJ erred in finding that Dr. Varghese failed to consider Plaintiff's undertreated status when rendering her opinions.

For all these reasons, substantial evidence supports the ALJ's consideration of Dr. Varghese's opinions.

### C.    SSR 18-3p

Plaintiff next argues that the ALJ misapplied SSR 18-3p when considering Plaintiff's failure to follow prescribed treatment. *Plaintiff's Brief*, ECF No. 8, pp. 40–48; *Plaintiff's Reply Brief*, ECF No. 17, pp. 11–13. This Court disagrees.

Regulation SSR 18-3p "provide[s] guidance on how [SSA] appl[ies] our failure to follow prescribed treatment policy in disability . . . claims under title II and XVI of the Social Security Act." SSR 18-3p, 2018 WL 4945641, *1. The Commissioner

> will determine whether an individual has failed to follow prescribed treatment only if all three of the following conditions exist:
>
> 1. The individual would otherwise be entitled to benefits based on disability or eligible for blindness benefits under titles II or XVI of the Act;
>
> 2. We have evidence that an individual's own medical source(s) prescribed treatment for the medically determinable impairment(s) upon which the disability finding is based; and

---

most recently undergone therapy in 2017 and was anxious about restarting it."). However, the ALJ also specifically noted that Plaintiff expressly stated that he was afraid of losing benefits if his mental health improved. R. 50 ("On November 3, 2017, the claimant . . . worried that since he had obtained disability, he would soon lose it and be worse off."; "The claimant admitted on November 10, 2017 that he did not attend his most recent session because he believed that he got better, he would lose his benefits with the VA."), 51 ("He was 100 percent service connected disability with the VA but was worried about it being taken away."), 55 ("He indicated to treating medical sources that he had been awarded benefits from the VA for his PTSD and feared losing them if he got better."; "He indicated that he was 100 percent service connected in his disability through the VA and worried about it being taken away suggesting that he was not working toward improvement by engaging in mental health treatment for this reason.").

3. We have evidence that the individual did not follow the prescribed treatment. If all three conditions exist, we will determine whether the individual failed to follow prescribed treatment, as explained below.

*Id*. at *2–3. In claims filed by adult claimants, "the individual has the burden to provide evidence showing that he or she has good cause for failing to follow prescribed treatment." *Id*. at *4. Listed examples of good cause are religion, cost, incapacity (meaning "[t]he individual is unable to understand the consequences of failing to follow prescribed treatment"), medical disagreement, intense fear of surgery, prior history, high risk of loss of limb, or risk of addiction to opioid medication. *Id*. at *5–6; *see also* 20 C.F.R. § 404.1530(c) ("We will consider your physical, mental, educational, and linguistic limitations . . . when determining if you have an acceptable reason for failure to follow prescribed treatment."). Other reasons for failure to follow prescribed treatment are considered on a case-by-case basis. SSR 18-3p, 2018 WL 4945641, at *6. Finally, "mere assertions or allegations about the effectiveness of the treatment are insufficient to meet the individual's burden to show good cause for not following the prescribed treatment." *Id*.

In the present case, the ALJ found, as detailed above, that Plaintiff was both undertreated and not disabled. R. 55–56. Alternatively, the ALJ found that, even if Plaintiff were disabled, SSR 18-3p precluded an award of benefits:

> In the alternative, even if the claimant was found to be disabled in this instance, SSR 18-3p would apply. The claimant was prescribed treatment to participate in mental health therapy sessions specifically targeting his PTSD and was prescribed multiple mental medications during the relevant period (Exhibits 1F, 4F, 5F, 6F, and 7F). The record suggests that he did not follow through with the treatment prescribed either at the University of Pennsylvania or the VA and he consistently stopped treating or declined to engage in treatment with medications deemed by his treating medical professionals to be of benefit prior to the date last insured.

> Next, the undersigned must examine whether the claimant's treatment if followed was expected to restore the claimant's ability to engage in substantial gainful activity. His medications targeted his anxiety and depression symptoms. He was in

therapy at the University of Pennsylvania to specifically address his PTSD but he did not participate fully (Exhibit 5F). However, when he ultimately returned to the VA and was offered the chance to engage in group therapy to address his PTSD, he chose not to do so (Exhibit 6F). Finally, it must be determined whether good cause supports the reason the claimant did not follow the prescribed treatment. In this instance, there are multiple references to the claimant's concern that if he got better and his PTSD was no longer affecting him so significantly that he would lose his VA benefits (Exhibit 5F). This concern reinforces the conclusion above that the treatment would be expected to restore the claimant's ability to engage in substantial gainful activity, which was his major concern about following through with prescribed treatment. His improvement following 12 sessions of anger management after the date last insured supports this conclusion (Exhibit 12F). The initial reason the claimant provided prior to the date last insured, that he would potentially lose his VA benefits if his PTSD improved, does not appear among the eight listed in SSR 18-3p for good cause reasons not to follow prescribed treatment. Nothing in the medical record dated after the date last insured changes these conclusions (Exhibit 12F). Further, the undersigned finds that his reason for not engaging in treatment does not fit within the parameters of the ninth reason as it does not match the intent or spirit of the previous good cause reasons. As a result, even if the undesigned found the claimant disabled in this instance, SSR 18-3p would apply.

R. 56–57.

Plaintiff argues that SSR 18-3p was inapplicable because all of the necessary conditions were not met, and, even if they had been met, the ALJ "misapplied" SSR 18-3p because she "failed to consider the impact" of Plaintiff's PTSD as good cause for not following prescribed treatment. *Plaintiff's Brief*, ECF No. 8, pp. 40–48; *Plaintiff's Reply Brief*, ECF No. 17, pp. 11–13.

The Court is not persuaded that this issue requires remand. As a preliminary matter, the Court notes that the ALJ did not in fact determine that Plaintiff was "otherwise entitled to benefits based on disability"; she simply stated in the alternative that SSR 18-3p would bar an award of benefits even if Plaintiff were found to be disabled. R. 56–57; *see also* SSR 18-3p, 2018 WL 4945641, *2–3; *cf. Ali v. Kijakazi*, No. 1:22-CV-00780, 2024 WL 1157073, at *9 (D. Del. Mar. 18, 2024) ("Here, however, the ALJ was not required to consider SSR 18-3p because

the first condition of the rule was not met. That is, the ALJ did not find that Ms. Ali would

otherwise be entitled to benefits based on disability.").

To the extent that Plaintiff argues that the ALJ disregarded his PTSD as a good reason for

avoiding treatment, or that the ALJ unfairly considered Plaintiff's failure to follow prescribed

treatment, those arguments are unavailing. As noted above, the ALJ specifically recognized that

Plaintiff had expressed difficulty engaging in therapy. *See e.g.,* R. 50-54. However, the ALJ also

referred to Plaintiff's fear of losing benefits if his mental health were improved. *See, e.g.,* R. 50-

51, 55. To the extent that there was conflicting evidence on this issue, the ALJ resolved that

conflict when she found that Plaintiff had failed to follow prescribed therapy because he was

afraid of losing benefits. R. 55–57. As explained above, this Court cannot reweigh the evidence

and must uphold a decision supported by substantial evidence even if contrary evidence in the

record exists. *See Messina*, 844 F. App'x at 589–90; *Johnson*, 497 F. App'x at 201; *Chandler*,

667 F.3d at 359; *Hatton*, 131 F. App'x at 880. Accordingly, an alleged misapplication or

purportedly flawed consideration of Plaintiff's PTSD on his failure to follow prescribed

treatment will not serve as a basis to remand this matter.

### D.    Step Two

Plaintiff argues that the ALJ applied an incorrect legal standard when finding at step two

of the sequential evaluation that none of his physical impairments were severe. *Plaintiff's Brief*,

ECF No. 8, pp. 49–59; *Plaintiff's Reply Brief*, ECF No. 17, pp. 13–15. Plaintiff specifically

argues that his diabetes (impairing his vision), sleep apnea, and right wrist injury were more than

slight abnormalities that should have been found to be severe and which should have been

factored into the RFC. *Id.* These arguments are not well taken.

At step two, an ALJ determines whether the claimant has a "severe impairment" or

combination of impairments that "significantly limits [the plaintiff's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). "The step-two inquiry is a *de minimis* screening device to dispose of groundless claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003) (citations omitted). "So long as the ALJ rules in Plaintiff's favor by finding that any single impairment meets the severity threshold required at step two, any error the ALJ made in this determination was harmless." *Auriemma v. Colvin*, No. 13-5947, 2015 WL 5097902, at *6 (D.N.J. Aug. 31, 2015) (citing *Salles v. Comm'r of Soc. Sec.*, 229 Γ. App'x 140, 145 n.2 (3d Cir. 2007) ("Because the ALJ found in [Plaintiff]'s favor at Step Two, even if he had erroneously concluded that some of h[is] other impairments were non-severe, any error was harmless."); *see also Orr v. Comm'r Soc. Sec.*, 805 F. App'x 85, 88 (3d Cir. 2020) ("Orr cannot overcome that fact: because the ALJ progressed to a later step, any error at Step Two would not alter the remainder of the five-step process, much less the overall outcome. And without more, Orr provides no valid basis for remand.").

As detailed above, the ALJ in the case presently before the Court decided in Plaintiff's favor at step two, when she found that Plaintiff's depressive disorder, anxiety disorder, and PTSD were severe. R. 38. The ALJ also explained at length why she found Plaintiff's physical impairments to be non-severe. R. 38–46. As for Plaintiff's diabetes mellitus (vision problems), sleep apnea, and right wrist injury, the ALJ explained why the evidence did not support a conclusion that these impairments caused vocationally relevant limitations, as follows:

> *Diabetes mellitus*
>
> The claimant testified on March 15, 2023 that he had problems with vision blurriness and his eyes hurt. He can look at a screen for 10 minutes. He needs to squint to see the television but he can hardly see it. He believed that his symptoms arose from his diabetes.
>
> The claimant's HgbA1c percent measured at 10.5 on August 9, 2017, 8.2 on

November 14, 2017 and 8.0 on March 27, 2018 (Exhibit 1F).

The claimant was placed on Semaglutide on January 28, 2019 (Exhibit 1F).

The claimant's blood tests for creatinine level were normal between February 28, 2019 and July 29, 2020 (Exhibit 1F).

Between June 21, 2019 and July 29, 2020, the claimant's HgbA1c percent measured below 7.00 (Exhibit 1F).

Christopher Suhr, O.D., concluded on July 29, 2020 that the clamant had mild diabetic retinopathy (Exhibit 1F). His visual acuity measured at 20/25 on the right and 20/40 on the left. IIis most recent examination prior to July 29, 2020 occurred on February 26, 2019 when he exhibited no diabetic retinopathy. The claimant's creatinine level was normal on November 23, 2020 (Exhibit 7F).

Gary Oxenberg, M.D., performed a consultative examination on January 15, 2021 (Exhibit 2F). He reported that he had no end organ manifestations arising from his diabetes including neuropathy, retinopathy or nephropathy. His most recent HbgA1c percent was 6.5 in November 2020. His visual acuity measured at 20/20 on the right and on the left with glasses. His Creatinine and eGFR levels were within normal range.

Gail Prater, C.R.N.P., examined the claimant on March 25, 2021 (Exhibit 7F). His latest blood glucose readings showed glycemic control. He was to continue treatment with Metformin, Levemir and Semaglutide.

The claimant's HgbA1c percent measured at 6.9 on April 1, 2021 (Exhibit 6F).

Mary Verderame, M.D., examined the claimant on April 1, 2021 (Exhibit 7F). He reported that his fasting blood glucose readings were generally at goal with a few elevated readings. He underwent no form of exercise. He occasionally walked the dog. His retinal examination in July 2020 showed no retinopathy. His creatinine level was normal.

The claimant's HgbA1c percent measured at 6.8 on October 7, 2021 (Exhibit 6F). His creatinine level was normal.

On December 29, 2021, the claimant's medications included 2,000 mg Metformin daily, Levemir and Semaglutide (Exhibit 12E).

### *After December 31, 2021 – Date Last Insured*

The claimant's HgbA1c percent on Janaury 21, 2022 was 6.6, which was above normal range but within normal range for an individual with diabetes (Exhibit 12F).

The claimant's HgbA1c percent on May 23, 2022 was 7.0, which was above normal range but within normal range for an individual with diabetes (Exhibit 12F).

Lisa Himmelein, O.D., examined the claimant on August 9, 2022 (Exhibit 12F). He reported no new changes to his vision. He did not bring his glasses but stated that he only used them for small print on the television and he could drive without glasses. He had mild diabetic retinopathy. He was noted to have presbyopia and he was provided with a revised prescription for glasses.

The claimant's HgbA1c percent on November 14, 2022 was 6.6, which was above normal range but within normal range for an individual with diabetes (Exhibit 12F). Barbara Lewis, N.P., noted that his pedal pulses were intact. His monofilament test was normal.

The undersigned notes that the claimant's diabetes was generally under good control after 2017 as it remained at 7.00 percent or below, which is the guideline for individuals with diabetes (Exhibits 1F, 2F, 6F and 12F). He has not developed end organ damage in his kidneys (Exhibits 1F, 6F, and 7F). There is no indication that he had developed neuropathy. While he complained about blurred vision, his most recent examination in 2021, prior to the date last insured, showed that his visual acuity was 20/20 on the left and the right with glasses (Exhibit 2F). He has only developed mild diabetic retinopathy and there is no objective evidence that it causes more than a minimal impact on his functioning during the relevant period (Exhibit 1F). Even after the date last insured, in August 2022, the claimant admitted that he had no new changes from his past examination in 2021, he admitted that he only used his glasses to read small print on the television, which is not consistent with his testimony that he needs to squint to see the television and he can hardly see it and he reported that he could drive without glasses (Exhibit 12F). While the claimant's testimony about his vision may be consistent with his current vision related issues, he has not established that such limitations arose prior to the date last insured. As a result, the undesigned finds that his diabetes is not severe.

R. 38–40.

*OSA*

The claimant underwent a sleep study on August 22, 2017 (Exhibit 1F). The study revealed findings consistent with obstructive sleep apnea.

Between February 6, 2021 and March 7, 2021 the claimant used CPAP 100 percent of the days and for 80 percent of those days, he used it for more than 4 hours (Exhibit 7F).

Between August 9, 2021 and September 7, 2021, the claimant's CPAP machine reported that he was using the device on 93 percent of the days and he used the

device for more than 4 hours in a night 76.7 percent of the time (Exhibit 6F). He was happy with his mask and he was noted to have excellent treatment compliance.

### After December 31, 2021 – Date Last Insured

Between August 8, 2022 and September 6, 2022 the claimant used the device 30 days and he engaged in 100 percent usage (Exhibit 12F). He used the device more than 4 hours per day for 83.3 percent of the time.

The undersigned notes that the claimant was diagnosed with obstructive sleep apnea in August 2017 (Exhibit 1F). His most recent reviews of his compliance show that he was using the device between 93 and 100 percent of the days in the period (Exhibits 6F and 7F). Further, contrary to the claimant's testimony on February 1, 2022 about sleeping 4 hours a night, his record reveals that he was sleeping more than 4 hours a night during 80 percent of February to March 2021 and 76 percent of nights between August and September 2021. As a result, his testimony concerning chronic sleep deprivation is found to be not persuasive and his obstructive sleep apnea is controlled and found to be not severe.

R. 42–43.

### Right Wrist Injury

The claimant testified on March 15, 2023 that he continued to experience weakness, tingling and aching in the right hand and wrist. He can lift up to 15 pounds with one hand. He had hardly lift his dog, who weighs 20 to 25 pounds.

Dr. Oxenberg performed a consultative examination on January 15, 2021 (Exhibit 2F). Upon examination, he exhibited full strength in the upper extremities with full pinch and grip strength and full manipulative functioning. He had a full range of motion in his wrists. The claimant informed Melanie Banks, R.N., on November 8, 2021 that he had fallen on November 6, 2021 and hurt his wrist (Exhibit 12F). He had treated for the injury at Urgent Care on November 7, 2021 and underwent an X-ray. He was provided with a splint. Ms. Banks advised the claimant about resting and using ice on the injury. On November 15, 2021, the claimant denied numbness, tingling or edema.

On November 19, 2021, an imaging study of the claimant's right wrist revealed no acute osseous abnormality (Exhibit 6F).

### After December 31, 2021 – Date Last Insured

The claimant informed Darla Taylor, L.P.N., on Janaury [sic] 6, 2022 that he re-injured his right hand and had broken a fall on the ice by landing on his hands (Exhibit 12F). He had pain but was able to move his fingers. He rated his pain at 7 out of 10.

An imaging study performed on January 10, 2022 revealed mild degenerative changes (Exhibit 6F).

Dainn Woo, M.D., examined the claimant on January 26, 2022 (Exhibit 12F). He reported that he had been provided with a splint, which had helped with the pain, but he was no longer using it. He had been taking Tylenol as needed, which relieved his pain. He had recently reinjured the wrist. He had no numbness in his fingers and could make a fist. He had a full range of motion in the wrist. He had generalized pain with no point tenderness. His strength was full. He was to use gentle range of motion exercises in the wrist. He was provided with a splint to use as needed and he was to continue treatment with Tylenol. He was to return in 3 months if no significant improvement occurred.

The undersigned notes that the claimant complained about a right wrist injury, which the medical record suggests arose in November 2021 (Exhibit 6F). The claimant's imaging was normal in November 2021. He denied numbness, tingling or edema on November 15, 2021 (Exhibit 12F). The medical record suggests that he re-injured the wrist after the date last insured. At that time, his imaging in January 2022 revealed only mild degenerative changes (Exhibit 6F). While the claimant testified on March 15, 2023 about weakness, tingling and aching with an inability to lift weight, he treated on one occasion with Dr. Woo in January 2022 concerning the wrist (Exhibit 12F). At that time, he was no longer using a splint, he admitted to no numbness., he had a full range of motion and no point tenderness with full strength. The claimant was advised to return in 3 months if no significant improvement occurred. There is no evidence that he returned for treatment in three month or thereafter. While the claimant may have developed the issues he discussed in his testimony after Dr. Woo's examination in Janaury [sic] 2022, there is no evidence to support the extent of his current limitations within the relevant period. As a result, the undersigned finds that his right wrist injury is not severe. The undersigned assigned manipulative limitations in the claimant's residual as assigned to consider the claimant's wrist pain.

R. 43–44.

Plaintiff raises several challenges to these findings. As to the ALJ's consideration of his diabetes, Plaintiff contends that the ALJ "selectively cited" evidence to support her finding at step two and insists that there was, in fact, objective evidence that his diabetes had more than a minimal impact on his functioning, pointing to instances of "uncontrolled" diabetes and to his subjective vision complaints. *Plaintiff's Brief*, ECF No. 8, pp. 55–56; *Plaintiff's Reply Brief*, ECF No. 17, pp. 13–14. The Court concludes that Plaintiff has not met his burden in showing

that his diabetes "significantly limits [his] physical or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). Despite Plaintiff's argument to the contrary, the ALJ's recitation of the relevant evidence detailed Plaintiff's generally normal or controlled readings over a period of years during the relevant period and after the lapse of his insured status. R. 38–40. The ALJ also specifically considered evidence regarding Plaintiff's vision, noting that Plaintiff exhibited no diabetic retinopathy in February 2019 and only mild diabetic retinopathy in July 2020 and again in August 2022 (after the date last insured), at which time he reported that he used his glasses only to see small print on television and could drive without glasses. R. 39–40 (noting further that, while he complained about blurred vision, Plaintiff's most recent examination in 2021, *i.e.,* prior to the lapse of his insured status, showed that his visual acuity was 20/20 on the left and the right with glasses). In addition, the ALJ considered that Plaintiff had not developed damage in his kidneys and there was no indication that he had developed neuropathy. R. 40. Moreover, Plaintiff has not pointed to any evidence or opinion that his diabetes had caused any functional limitations prior to the date that his insured status expired. To the extent that Plaintiff points to evidence in the record showing that his diabetes was uncontrolled at times during the relevant period, this Court has already explained that it cannot reweigh the evidence and will uphold the ALJ's properly supported decision even if contrary evidence in the record exists. *See Messina*, 844 F. App'x at 589–90; *Johnson*, 497 F. App'x at 201; *Chandler*, 667 F.3d at 359; *Hatton*, 131 F. App'x at 880. Based on this record, Plaintiff has not established that the ALJ erred in finding that his diabetes was not severe.

Plaintiff next complains that the ALJ erred in finding that his sleep apnea was not severe, pointing to his hearing testimony as well as to statements from his wife that he had trouble falling asleep and had nightmares; did not sleep well despite proper use of a CPAP machine; and

was tired during the day because he did not get enough sleep. *Plaintiff's Brief*, ECF No. 8, pp. 56–57; *Plaintiff's Reply Brief*, ECF No. 17, pp. 14–15. The Court is not persuaded that the ALJ's consideration of Plaintiff's sleep apnea amounted to reversible error. As detailed above, the ALJ noted at step two that Plaintiff used his CPAP machine, which adequately controlled his sleep apnea. R. 42–43. The ALJ also expressly considered Plaintiff's complaints of sleep problems/insomnia (separately caused by his mental impairments) at step four. R. 52. The ALJ further noted that Plaintiff reported to Dr. Varghese in March 2021 that his sleep was stable. *Id.* Notably, Plaintiff, who bears the burden at step two, does not explain how his sleep apnea significantly limited his physical or mental ability to do basic work activities during the relevant period. *See* 20 C.F.R. § 404.1520(c); *Plaintiff's Brief*, ECF No. 8, pp. 56–57; *Plaintiff's Reply Brief*, ECF No. 17, pp. 14–15. Accordingly, the Court cannot conclude that Plaintiff has shown that the ALJ erred in finding that Plaintiff's sleep apnea was not severe.

Plaintiff also contends that the ALJ should have found that his right wrist injury was severe, pointing to his testimony about weakness, tingling, and aching. *Plaintiff's Brief*, ECF No. 8, p. 57. Plaintiff also argues that the imaging study taken in November 2021, and referenced by the ALJ, revealed mild degenerative changes, which "is more than a slight abnormality." *Id.* (citing R. 43, 1213–14, 1590–91). Plaintiff contends that the ALJ's error in failing to find his right wrist injury to be nonsevere is not harmless because the ALJ found that Plaintiff was capable of performing work at all exertional levels, which is inconsistent with a right wrist injury. *Id.* at 58. Plaintiff contends that he would have been found disabled under the Grids as of his 50th birthday in November 2019 if he could were found able to perform only sedentary work. *Id.* at 58–59.

Plaintiff's arguments are not well taken. Although Plaintiff highlights the "mild degenerative changes" seen in a November 2021imaging study, the ALJ properly focused on assessing any functional limitations flowing from Plaintiff's right wrist injury to determine if that impairment "significantly limits" his physical ability to perform basic work activities. R. 43–44; *see also* 20 C.F.R. § 404.1520(c). For example, the ALJ noted that, after Plaintiff's reported wrist injury on November 8, 2021, he was treated for that injury and denied numbness, tingling, or edema on November 15, 2021. R. 43. Plaintiff reported re-injuring his right hand when he fell on January 6, 2022 (after the lapse of his insured status after December 31, 2021), but an examination on January 26, 2022, revealed that a splint had helped with the pain, but that he was no longer using it; Tylenol had relieved the pain; he had no numbness in his fingers, could make a fist, and had a full range of motion and strength in the wrist. R. 44. While Plaintiff was to return in three months if no significant improvement were to occur, there is no evidence that he in fact returned. *Id*. For these reasons Plaintiff has not shown that the ALJ erred in finding no severe impairment of Plaintiff's right wrist.[9]

In short, Plaintiff has not shown that this record establishes that the ALJ erred when finding that none of Plaintiff's physical impairments were severe at step two.

### E.    Third Party Evidence

When crafting the RFC, the ALJ specifically considered evidence provided by Plaintiff's wife, finding it "partially persuasive":

> Pursuant to SSR 16-3p, the undersigned evaluated the opinions and testimony of Ms. S[.] for persuasiveness (Exhibits 5E and 17E). The undersigned finds that her opinions are partially persuasive. The undersigned refers to the discussion in Finding 4 regarding the claimant's mental functioning, which discusses the extent to which her opinion is found persuasive.

---

[9] The ALJ nevertheless assigned manipulative limitations. R. 44; *see also* R. 48 (restricting Plaintiff to, *inter alia*, frequent handling and fingering).

R. 58. Plaintiff, however, contends that the ALJ failed to properly address this third party evidence. *Plaintiff's Brief*, ECF No. 8, pp. 59–64; *Plaintiff's Reply Brief*, ECF No. 17, pp. 15–21. Plaintiff complains that the ALJ did not provide "any reasons for not crediting this testimony" and that the ALJ simply referred to Finding 4, which was supportive of Plaintiff's claim. *Id*. Plaintiff further complains that the ALJ "never specifically discredited" several aspects of his wife's testimony and the ALJ's failure to provide reasons for why she did not fully credit such testimony requires remand. *Id*.

As previously detailed, the ALJ specifically considered Plaintiff's wife's hearing testimony and third party report in Finding 4. R. 46–48. It is evident in that discussion which portions of the third party evidence the ALJ accepted and which she rejected. *Id*. For example, in discussing the functional areas of understanding, remembering or applying information; interacting with others; and adapting or managing himself, the ALJ implicitly accepted the third party evidence when assigning moderate limitations in those areas. *Id*. Conversely, the ALJ expressly rejected Plaintiff's wife's third party report that Plaintiff had problems with concentration and paying attention but found that "[o]bjective evidence reveals that his concentration and attention were intact." R. 47. In any event, the ALJ nevertheless assigned a moderate limitation in this area of mental functioning when considering Plaintiff's subjective complaints. *Id*. Plaintiff has not persuaded this Court that this discussion does not sufficiently reveal the ALJ's consideration of his wife's testimony. *Cf. Louis v. Comm'r Soc. Sec*., 808 F. App'x 114, 122 (3d Cir. 2020) ("The ALJ discounted [the plaintiff's] mother's reports because they were inconsistent with the previously discussed objective medical evidence and medical opinions. This reason was sufficient by itself to support the ALJ's decision.").

42

To the extent that Plaintiff complains that the ALJ failed to specifically discuss particular statements of his wife, he has not established that any such failure amounts to reversible error. As an initial matter, Plaintiff has not shown that the ALJ was required to refer to every statement made by his wife. *Cf. Fargnoli*, 247 F.3d at 42 (stating that the Court does "not expect the ALJ to make reference to every relevant treatment note in a case"); *Davison v. Comm'r of Soc. Sec.*, No. CV 18-15840, 2020 WL 3638414, at *8 (D.N.J. July 6, 2020) ("The ALJ cited to multiple other reports and surveyed a significant amount of evidence. He was not required to discuss or describe every page of the record."). Moreover, Plaintiff, who bears the burden of proof, has not explained why the RFC failed to accommodate any particular limitation suggested by the third party statements or why any such statements required different or additional RFC limitations. *See generally Plaintiff's Brief*, ECF No. 8; *Plaintiff's Reply Brief*, ECF No. 17. Remand is therefore not required on this basis. *See Shinseki v. Sanders*, 556 U.S. 396, 409–10 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination. . . . [T]he party seeking reversal normally must explain why the erroneous ruling caused harm."); *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d. Cir. 2005) (finding that "a remand is not required here because it would not affect the outcome of the case"); *cf. Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011) ("An error is 'harmless' when, despite the technical correctness of an appellant's legal contention, there is also 'no set of facts' upon which the appellant could recover.") (citation omitted).

For all these reasons, the Court **AFFIRMS** the Commissioner's decision. The Court will issue a separate Order issuing final judgment pursuant to Sentence 4 of 42 U.S.C. § 405(g).

October 8, 2025

_____*s/Norah McCann King*_____
NORAH McCANN KING
UNITED STATES MAGISTRATE JUDGE

43